Filed 1/27/15

CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>STEVEN ANDREW ZINDA,<br><br>        Defendant and Appellant. | C072981<br><br>(Super. Ct. No. 11F02036) |

APPEAL from a judgment of the Superior Court of Sacramento County, Marjorie Koller, Judge.  Affirmed.

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, Catherine Chatman and Larenda R. Delaini, Deputy Attorneys General, for Plaintiff and Respondent.

---

<sup>*</sup>    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication in the official reports with the exception of parts II and III of the discussion.

1

Defendant Steven Andrew Zinda chased David Valdez into a field and murdered him with an axe. Tragically, a poor decision placed Valdez in the wrong place at the wrong time. After drinking with some friends at a house in Rio Linda, Valdez decided to leave around 2:00 a.m. He was intoxicated and did not make it very far before driving his Honda Passport into a ditch near defendant's house. Valdez stayed with his vehicle while two friends left in a truck to get some tow chains. Meanwhile, defendant's house was being burglarized. Defendant stayed the night at a friend's house, but had reason to believe certain neighborhood gang members wanted to steal from him, so he set his alarm for 3:00 a.m. and stopped by his house to check on it before his early morning work shift. He arrived to find the burglary in progress. One burglar fled to a waiting car and drove away. Defendant went into his house, grabbed an axe from inside, and came back out. He then saw Valdez waiting for his friends on the side of the road. Assuming Valdez was one of the burglars, defendant walked out to him with the axe and yelled: "Did your buddies leave you, man?" Valdez ran. Defendant took this to be an admission of guilt and gave chase with the axe. When he caught up to Valdez in a field about a quarter mile away, defendant swung the axe and either "missed him the first time" or "got him like in the shoulder or maybe his upper body." He then grappled with Valdez on the ground, "givin him elbows," and swung the axe a second time, which "gashed him up on his face." Defendant then hit Valdez with the axe "one or two more times . . . to finish it off."

Defendant was convicted by jury of second degree murder and found to have personally used a deadly weapon during the commission of the crime. He was sentenced to serve an indeterminate prison term of 15 years to life plus a consecutive determinate term of one year.

On appeal, defendant contends the trial court: (1) erred by not instructing the jury, sua sponte, on (a) justifiable homicide in making an arrest, and (b) mistake of fact; (2)

2

erroneously instructed the jury on heat of passion voluntary manslaughter; and (3) erroneously excluded "evidence that [Valdez] claimed a gang affiliation, and photographs which either suggested a gang affiliation or gave a more accurate and neutral portrait of the victim near the time of his death."

We affirm the judgment. As we explain, defendant was not entitled to a sua sponte instruction on justifiable homicide in making an arrest or mistake of fact. The justifiable homicide instruction was not supported by substantial evidence because there was no evidence defendant was attempting to arrest Valdez for burglary. Such a theory was also inconsistent with defendant's theory of the case, i.e., while defendant killed Valdez unlawfully, the crime was not murder but voluntary manslaughter. The mistake of fact instruction also lacks evidentiary support because defendant's erroneous belief Valdez was involved in the burglary does not make killing him with multiple axe blows an innocent act. Nor is mistake of fact a true affirmative defense implicating the trial court's sua sponte instructional duties. We need not determine whether the trial court erroneously instructed the jury on heat of passion voluntary manslaughter because defendant was not entitled to voluntary manslaughter instructions. Nor did the trial court abuse its discretion by excluding the proffered photographic evidence and other evidence Valdez claimed a gang affiliation.

FACTS

On the night of March 19, 2011, Valdez and a close friend, Justin Trammell, went to a house in Rio Linda where they drank alcohol and played cards with friends. Valdez and Trammell rode to the house together in Valdez's Honda Passport, a midsize SUV. Valdez drove and brought over a large bottle of rum. Renee Ross was in charge of the house for the night; she was watching her three half-sisters while her father and stepmother were out of town. Ross's boyfriend, Craig Seagrove, was also at the house,

3

as were several other people. Ross apparently collected car keys since they would be drinking.

Around 2:00 a.m., Valdez and Trammell decided to leave. They were intoxicated. Ross tried to keep them from leaving, but Valdez "got the keys back" and walked out of the house carrying the bottle of rum. Trammell followed. So did Seagrove. Valdez and Trammell left in the Passport, which did not make it very far before sliding off the road and into a ditch. Seagrove witnessed the crash from the driveway and walked over to the Passport as Valdez spun the tires in the mud. At 2:51 a.m., after various unsuccessful attempts to extricate the vehicle from the ditch, Valdez called another friend, Cory Rossbo, and asked him to bring his four-wheel-drive Chevy truck to pull the Passport out of the ditch. Rossbo agreed. Seagrove went back to the house. When Rossbo arrived about 10 minutes later, he realized he did not have the proper equipment, so Trammell got into the Chevy and the two drove to Trammell's house to pick up tow chains. Valdez stayed with his vehicle.

On the way to Trammell's house, Rossbo noticed a nearby house's garage door was open and two men were walking around in the garage. The house belonged to defendant, who had stayed the night at a friend's house after watching a pay-per-view UFC fight. The people in the garage were burglars. Defendant, who believed his house was in danger of being burglarized by neighborhood gang members, had set his alarm for 3:00 a.m. so he could check on his house before his early morning work shift. He arrived around 3:15 a.m. to find a small white car parked in front of his house and the garage door wide open. Defendant pulled into his driveway and ran into the house through the garage. Hearing the front door shut as he entered the house, defendant grabbed a golf club and ran out the front door. One of the burglars was getting into the white car. Defendant gave chase and hit the car with the golf club as it drove away. He then returned to the house, shut the garage door, and assessed what had been taken in the

4

burglary. A short time later, defendant went back outside, this time with an axe, and noticed Valdez on the side of the road a short distance from the house.

Defendant assumed Valdez was involved in the burglary, walked over to him carrying the axe, and yelled: "Hey what happened to you? Did your buddies leave you, man?" Valdez ran. Defendant took this to be an acknowledgment of guilt and gave chase with the axe. He described the pursuit: "I'm runnin with my axe, dude, . . . right behind him and shit, dude, and he's getting all tired, dude. He's goin on both sides of the road and shit, like not knowin where to . . . go, dude." Defendant caught up to Valdez about a quarter mile away. Valdez climbed a fence in an attempt to escape through a field, but fell over the top of the fence and landed on the ground. Defendant reached the fence about the same time, entered the field through a gate, and confronted Valdez: "You tryin to rob my house, man?" He then "took a swing at him." Defendant elaborated: "I hit him with the axe the first time or I think I mighta missed him a little bit, but maybe got him in the upper body and then . . . I'm scufflin around with him, dude I'm givin him elbows, dude, that's close combat, dude." Defendant then swung the axe a second time, which "gashed him up on his face," followed by "one or two more" swings of the axe "to finish it off." Defendant kicked Valdez in the back before returning to his house.

Meanwhile, when Trammell and Rossbo got to Trammell's house to pick up the tow chains, they discovered Trammell's horses had escaped from their enclosure. Collecting the horses took at least an hour. At 3:41 a.m., Rossbo called Valdez to let him know they would be late with the tow chains, but Valdez did not answer his cell phone. Around 4:00 a.m., after the horses were put away, Trammell called Valdez several times. Again, no one answered. Trammell and Rossbo then returned to the Passport with the tow chains. There was no sign of Valdez. Assuming he had gone to a girlfriend's house, which was nearby, Trammell and Rossbo abandoned the mission and returned to their respective homes.

Around the same time, defendant called his sister and told her what had happened. He called 911 about 30 minutes later. When sheriff's deputies arrived, defendant directed them to Valdez's body, indicating he believed Valdez to be a member of a local street gang called the Boss Hoggs. Valdez was pronounced dead at the scene. Later in the morning, defendant gave a full statement to Detective Stanley Swisher. His account of events was that described above. During the interview, defendant also stated he "always kinda had problems" with neighborhood "gang bangers" who claimed to be affiliated with a southern California street gang called the Pirus. When Detective Swisher posited the scenario that Valdez was simply waiting for his friends to arrive to pull his car out of the ditch when defendant came home to find his house being burglarized by other people, and ran not because he was involved in the burglary, but rather because defendant was "pissed off" and coming at him with a "big axe," defendant said he would be "devastated" if he killed Valdez for the wrong reasons.

## DISCUSSION

## I

### *Failure to Instruct on Defenses*

Defendant contends the trial court erred by not instructing the jury, sua sponte, on two defenses: justifiable homicide in making an arrest, and mistake of fact. He is mistaken.

"A trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.' [Citation.] . . . [A] trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.' " ' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 517.)

6

## A.

### *Justifiable Homicide in Making an Arrest*

Penal Code section 197 provides in relevant part that homicide is justifiable "[w]hen necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed . . . ."[1] (§ 197, subd. (4).)

There appears to be disagreement in the appellate decisions interpreting this provision as to the meaning of "any felony." In *People v. Piorkowski* (1974) 41 Cal.App.3d 324 (*Piorkowski*), the Second District Court of Appeal explained: "At common law, one could use deadly force to prevent the commission of a felony. [Citation.] Statutory expansion of the class of crimes punishable as felonies has made the common law rule manifestly too broad. [Citation.] It appears that the principle that deadly force may be directed toward the arrest of a felon is a correct statement of the law *only where the felony committed is one which threatens death or great bodily harm*. [Citation.]" (*Id.* at pp. 328-329, italics added.) There, the victim and two accomplices entered a dry cleaning establishment during business hours and stole a dollar bill from the counter and a wallet from a purse that was behind the counter. (*Id.* at p. 328.) The court held, "the character of the crime and the manner of its perpetration did not warrant the use of deadly force to effect the [victim's] arrest, i.e., [the homicide] was not 'necessarily committed,' " and explained: "While this factual pattern may constitute 'statutory burglary,' which is a felony . . . clearly there is not the attendant risk to human life which accompanies common law burglary." (*Id.* at p. 330.)

In *People v. Quesada* (1980) 113 Cal.App.3d 533 (*Quesada*), the First District Court of Appeal applied the reasoning of *Piorkowski, supra,* 41 Cal.App.3d 324 to a homicide committed while the defendant attempted to apprehend a person suspected of

---

[1]    Undesignated statutory references are to the Penal Code.

burglarizing his unoccupied home *two days earlier*. The defendant engaged others to buy a stereo from the suspect, confirmed the stereo had been stolen from his apartment, and tried to make an arrest. When the suspect drove away, the defendant shot and killed him. (*Quesada, supra,* at pp. 536-537.) The court held the trial court did not err in refusing to instruct the jury that "homicide is justifiable 'when necessarily committed in attempting, by lawful ways and means, to apprehend any person who has committed burglary of the first degree.' " (*Id.* at pp. 537, 540.) The court explained that "since a burglary committed when no one is on the premises is not a crime which threatens death or serious bodily harm so as to justify the use of deadly force in preventing its occurrence," e.g., the use of a trap gun to prevent a burglary (see *People v. Ceballos* (1974) 12 Cal.3d 470), "it would seem to follow that it is not, or *at least not per se*, the sort of crime which justifies the use of deadly force by a citizen in apprehending the criminal. In the latter case, as well as the former, the modern common law rule limits the use of deadly force to 'dangerous' felonies: 'The law does not permit the use of deadly force for the mere purpose of *preventing* a nondangerous felony, and a private person cannot defeat this restriction merely by saying his [or her] purpose is arrest rather than prevention.' [Citations.]" (*Quesada*, *supra*, 113 Cal.App.3d at p. 539, first italics added; fn. omitted.)

However, in *People v. Martin* (1985) 168 Cal.App.3d 1111 (*Martin*), the Fifth District Court of Appeal affirmed the dismissal of an information under section 995 where the defendant, an off-duty deputy sheriff who lived next door to his son, interrupted a common law burglary of the son's house and, knowing no one was home at his son's house, shot and killed one of the fleeing burglars. (*Id.* at p. 1114.) The court explained the conclusion in *Piorkowski, supra,* 41 Cal.App.3d 324 that the felony committed must threaten death or great bodily harm was based on *People v. Jones* (1961) 191 Cal.App.2d 478, a case interpreting section 197, subdivision (1), which provides that homicide is justified "[w]hen resisting any attempt to murder any person, or to commit a

felony, or to do some great bodily injury upon any person." Pointing out *Jones* "dealt with a felony (wife-beating) not recognized at the time section 197 was enacted," the court went on to explain: "There are important differences between subdivisions 1 and 4 of section 197. Under subdivision 1, homicide is justifiable in resisting an attempt to murder, or to commit a felony, or to do some great bodily injury. The language before and after 'to commit a felony' implies that the felony contemplated by that statute is one more dangerous than a personal assault. Additionally, at common law there was a broader privilege to use deadly force in arresting a felon than in preventing his [or her] criminal act. [Citation.]" (*Martin*, *supra*, 168 Cal.App.3d at p. 1118.)

Distinguishing *Quesada, supra*, 113 Cal.App.3d 533, the *Martin* court explained the instruction requested in that case "made no distinction between apprehension of the person who had committed the burglary while fleeing from the scene and apprehension after the felon had completed his [or her] escape. The social need for justification of a homicide committed in the latter circumstance, as in *Quesada*, is virtually nonexistent. In sharp contrast, failure to apprehend when the felon is fleeing the scene of the crime frequently means that the felon remains at large. Later investigation cannot represent a substitute for immediate apprehension. [Citation.] Accordingly, a person may reasonably expect that he [or she] is justified in using deadly force to apprehend a felon fleeing the scene of the crime. No such reasonable expectation could exist in attempting apprehension after escape. Other safer and less drastic procedures for apprehension after escape are well known." (*Martin*, *supra*, 168 Cal.App.3d at pp. 1122-1123.) The court then found the "any felony" language of section 197, subdivision (4), to be ambiguous, construed the provision " 'as favorably to the defendant as its language and the circumstances of its application may reasonably permit,' " and concluded the Legislature intended "to include in the definition of 'any felony' those crimes which were felonies at

9

common law" when section 197 was enacted, "including nighttime burglary of a dwelling house." (*Id*. at p. 1123.)

We agree with *Martin* on the meaning of "any felony" in the statute. However, *Piorkowski* turned not on this language, but on the meaning of "necessarily committed," holding a homicide is "necessarily committed" in attempting to apprehend a felon within the meaning of section 197, subdivision (4), "only where the felony committed is one which threatens death or great bodily harm." (*Piorkowski*, *supra*, 41 Cal.App.3d at pp. 328-330.) In other words, as a matter of law, unless the felony threatens death or great bodily harm, the use of deadly force in apprehending the perpetrator is an unnecessary and unjustified use of force. Ordinarily, common law burglary would qualify. " 'Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety.' " (*People v. Gauze* (1975) 15 Cal.3d 709, 715, quoting *People v. Lewis* (1969) 274 Cal.App.2d 912, 920.) However, as *Quesada* explains, the fact there was a common law burglary does not, in and of itself, justify the use of deadly force in apprehending the perpetrator. (*Quesada*, *supra*, 113 Cal.App.3d at p. 539 [common law burglary does not "per se" justify the use of deadly force by a citizen in apprehending the criminal].) There, it was not necessary for the defendant to attempt to apprehend the burglar at all. Where the burglary was committed two days before the attempted apprehension, there was plenty of time to enlist the professional assistance of law enforcement. *Martin* presents the more typical case of a common law burglary that is interrupted in progress. While the occupants of the home

were elsewhere, the crime still threatened death or great bodily harm since they could return at any time, or, as happened, a neighbor could decide to investigate the situation and confront the burglars. And, unlike *Quesada*, there was no intervening period of two days rendering a citizen's arrest unnecessary.

Here, as in *Martin, supra*, 168 Cal.App.3d 1111, defendant interrupted a common law burglary in progress. However, unlike *Martin*, there is no evidence defendant attempted to arrest Valdez. By his own account of events, defendant chased Valdez about a quarter mile with the axe and killed him, not in an attempt to arrest him for the burglary, but because, as he put it, "just the way he looked to me, dude, he . . . wasn't a good person," and "these people are the type of people that are gonna threaten my life, dude." There was no attempted arrest; only a completed murder. Nor did defendant possess probable cause to arrest Valdez for burglary. After the only person defendant knew was involved in the burglary escaped by driving away, defendant went into the house and came back outside with an axe, saw Valdez on the side of the road, and simply assumed he was involved in the burglary. Neither defendant's assumption about Valdez's involvement nor the fact Valdez ran provided probable cause for arrest. Indeed, it is hard to imagine anyone who would have stayed put at the sight of an angry defendant approaching with an axe in the middle of the night. Without probable cause to arrest Valdez for burglary, the use of deadly force in making such an arrest was ipso facto unjustified. (See *Piorkowski*, *supra*, 41 Cal.App.3d at p. 328.)

Defendant's claim of instructional error fails for a separate reason. As stated previously, "a trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense *and the defense is not inconsistent with the defendant's theory of the case*.' " ' [Citation.]" (*People v. Abilez*, *supra*, 41 Cal.4th at p. 517, italics added.) At trial, the defense conceded the

11

killing was unlawful, but argued the crime was not murder, but voluntary manslaughter because defendant acted "rashly" and "impulsively" under intense provocation. The theory now advanced on appeal, that the killing was a justifiable homicide necessarily committed in attempting to apprehend Valdez for burglary, is inconsistent with defendant's theory of the case.

We conclude the trial court had no sua sponte duty to instruct the jury on justifiable homicide.

## B.

### *Mistake of Fact*

We also conclude the trial court had no sua sponte duty to instruct on mistake of fact. The " 'defense' of mistake of fact requires, at a minimum, an actual belief 'in the existence of circumstances, which, if true, would make the act with which the person is charged an innocent act. . . .' [Citations.]" (*People v. Lawson* (2013) 215 Cal.App.4th 108, 115.) The circumstance about which defendant claims to have been mistaken is Valdez's status as a perpetrator or accomplice in the burglary of his house. Defendant does not assert this circumstance *alone* would make killing Valdez with multiple axe blows an innocent act. Instead, he argues: "In conjunction with [the justifiable homicide instruction,] the mistake-of-fact instruction would have made 'the act charged an innocent act.' " We have already explained the justifiable homicide instruction was not supported by substantial evidence because there was no evidence defendant was attempting to arrest Valdez for burglary. Thus, all that remains is defendant's mistaken belief Valdez was a burglar. Even if true, this circumstance does not insulate defendant from criminal liability. Accordingly, the mistake of fact instruction was not supported by substantial evidence. Moreover, mistake of fact is "not a true affirmative defense," but instead "serve[s] only to negate the mental state element of the crime. . . . Thus, even if substantial evidence supported an instruction on mistake of fact, the trial court had no

12

duty to instruct on the defense sua sponte." (*People v. Lawson*, *supra*, 215 Cal.App.4th at p. 118.)

## II

### *Voluntary Manslaughter Instructions*

Defendant also claims the trial court erroneously instructed the jury on heat of passion voluntary manslaughter. We need not determine whether the instructions were erroneous because defendant was not entitled to voluntary manslaughter instructions in the first place.

"Manslaughter is a lesser included offense of murder. [Citations.] The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, [i.e., express or implied malice,] a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

In accordance with these principles, the jury was instructed with CALCRIM No. 570: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat

13

of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation; that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I've defined it. [¶] While no specific type of provocation is required, slight or remote provocation is not sufficient. [¶] Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. [¶] In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment."

The jury was also instructed with a pinpoint instruction requested by the prosecution: "The provocation that incites the defendant to homicidal conduct in the heat of passion must be caused by the victim or be conduct reasonably believed by the defendant to have been engaged in by the victim. [¶] . . . [¶] The heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances. [¶] The provocation must be such that an average person would be so inflamed that he or she would lose reason or judgment." This language was taken almost verbatim from the case law. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 583 ["provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim . . . or be conduct reasonably believed by the defendant to have been engaged in by the victim"]; *People v. Steele*

14

(2002) 27 Cal.4th 1230, 1252 [" 'heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances' "]; *People v. Thomas* (2012) 53 Cal.4th 771, 813 [" 'provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment' "].)

The trial court declined to provide the jury with a pinpoint instruction requested by the defense: "The average person need not have been provoked to kill, just to act rashly and without deliberation." This language is a paraphrase of *People v. Najera* (2006) 138 Cal.App.4th 212, a case in which the prosecutor misstated the law by directing the jury to focus on whether a reasonable person would "be so aroused as to kill somebody," and the court explained: "The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*Id*. at p. 223.) The trial court found the proposed pinpoint instruction to be generally accurate, but "somewhat misleading . . . without more explanation." Defense counsel did not offer to provide more explanation.

Defendant argues: "The trial court erred by reading the prosecutor's instruction that legal provocation must cause the defendant to 'lose reason or judgment,' and refusing the defense instruction that the average person 'need not have been provoked to kill, just to act rashly and without deliberation.' " According to defendant, the "lose reason or judgment" language in the prosecution's pinpoint instruction conflicted with the "reacted from passion rather than from judgment" language in CALCRIM No. 570, the latter providing "a threshold which was sufficiently low that the defense had a reasonable chance of success," while the former "put the bar beyond reach of the defendant, requiring that the average person be reduced to a raving lunatic in order for the defendant to meet the definition." We disagree with defendant's hyperbolic

15

interpretation of the prosecution's pinpoint instruction. However, we need not determine whether the trial court should have relied exclusively on CALCRIM No. 570 for the definition of heat of passion voluntary manslaughter, supplemented by his preferred pinpoint instruction, because we conclude defendant was not entitled to voluntary manslaughter instructions in the first place.

For present purposes, the following statement of the law is dispositive: "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim . . . *or be conduct reasonably believed by the defendant to have been engaged in by the victim.*" (*People v. Manriquez, supra*, 37 Cal.4th at p. 583, italics added.) Here, the provocation was the burglary of defendant's house. However, defendant had no reasonable basis to believe Valdez was involved in the burglary. While we have no doubt defendant actually believed Valdez was involved, "the circumstances giving rise to the heat of passion are also viewed objectively." (*People v. Steele, supra*, 27 Cal.4th at p. 1252.) Valdez was standing on the side of the road next to his Honda Passport that was stuck in a ditch. Defendant admitted to Detective Swisher that he saw the vehicle in the ditch, but stated he did not notice it until he was walking back to his house after killing Valdez. We conclude a reasonable person in defendant's position, even under the stress of coming home to find his house being burglarized, would have more carefully assessed the situation on the side of the road before concluding Valdez was involved in the burglary. Because no reasonable jury would have concluded defendant *reasonably* believed Valdez provoked him, he was not entitled to an instruction on voluntary manslaughter. (See *People v. Verdugo* (2010) 50 Cal.4th 263, 294 [voluntary manslaughter instruction given with respect to one victim where the defendant reasonably believed victim attacked his friend; no error in refusing to give such an instruction with respect to a second victim where no reasonable jury would have found defendant reasonably believed this victim engaged in provocative conduct].)

16

"Thus, although the trial court instructed the jury on heat of passion voluntary manslaughter out of caution, it did not have to do so, as no evidence supported the instructions. Accordingly, the court did not have to give yet more instructions on the point." (*People v. Steele*, *supra*, 27 Cal.4th at pp. 1253-1254.) For the same reason, any misstatement in the prosecution's pinpoint instruction, or in the prosecutor's closing argument to the jury, would be harmless error. (See *People v. Najera*, *supra*, 138 Cal.App.4th at pp. 225-226.)

## III

### *Exclusion of Evidence*

Defendant further asserts the trial court erroneously excluded "evidence that [Valdez] claimed a gang affiliation, and photographs which either suggested a gang affiliation or gave a more accurate and neutral portrait of the victim near the time of his death." We are not persuaded.

### A.

### *Additional Background*

The prosecution moved in limine to exclude any reference to Valdez being associated with any criminal street gang, arguing: "There is no evidence of [Valdez] having any gang affiliation. The defense should not be permitted to make any such references in this trial." During argument on the motion, defense counsel proposed the trial court delay making a ruling until after the prosecution's case was presented to the jury, arguing there would likely be evidence Valdez "could have possibly had associates with a gang by the name of Boss Hoggs." Specifically, defense counsel referred to the statements defendant made to deputies in a patrol car as he directed them to the murder scene, and that were captured on the in-car camera system, indicating defendant believed Valdez was a member of the Boss Hoggs.

17

The prosecutor countered that defendant's "rant" about the Boss Hoggs did not provide evidence Valdez was actually a member of any criminal street gang and stated: "I've been shown today for the first time a color copy of a photograph of David Valdez. I don't know when it was taken. I don't know who gave it to the defense. It purports to show the victim standing in a red shirt next to a woman who's in a red shirt. The victim is holding up his fingers, it looks like three fingers on one hand and maybe two or three on the other hand. [¶] I asked the defense was there any, you know, expert that looked at this and said this is some type of a known gang sign, and I was told no, there's no information that this photograph shows David Valdez depicting any gang signs. [¶] I don't know when it was taken, where it came from or what he's doing with his fingers. [¶] But in addition to this motion of made-up gang affiliation of the victim, I also move to exclude this photograph of the victim that I know nothing else about. It's simply not relevant."

Defense counsel argued the police investigation was not "a hundred percent conclusive" that Valdez was not a gang member, but added: "Was he a member? Well, you know, I don't think so, but maybe. [¶] This is an issue that can be ruled upon after the close of the People's case-in-chief, Your Honor."

The trial court granted the prosecution's motion, explaining: "Well, persons who are saying it maybe somebody might have been a member of a gang in conjunction with a statement from the defendant that he had never seen this guy before doesn't give the Court a lot of confidence that the relevant purpose, which would be if this defendant knew that this victim was a member of Boss Hogg and acted because of that, in which case it would be relevant, but without that I'm not seeing any relevance, to either the photograph or some people saying he knew people that were. And I imagine that that's a result of living in an area where a certain gang is active. But I haven't heard anything

18

definitive that [Valdez] either is a member of Boss Hogg, and if he was that the defendant knew it, which is really the only reason it would be relevant."

The following day, the prosecutor again moved to exclude the aforementioned picture of Valdez and any reference to him being in a gang. The motion was based on an offer of proof from defense counsel regarding potential testimony from Valdez's girlfriend, specifically that the picture did depict Valdez "showing gang signs." Defense counsel argued the trial court should not "completely foreclose" the possibility of proving Valdez was a gang member.

The trial court ruled: "Just looking at the photograph on its face, I have to agree that there isn't any reason to think that this is anything other than gang signs. I don't know what else it would be. I think an expert would probably testify that these are gang signs. I'm not suggesting that I have any particular expertise in the area, but I couldn't foreclose that as a possibility that it's a gang photograph. [¶] The other question, though, is whether or not the victim's association with or in this photograph representation of a gang is relevant in the murder trial, those are two different things. Whether or not he is actually part of a gang is different than whether or not the defendant at the time that he encountered this victim thought he was part of the gang and was acting as part of the gang, which is two different things to me." The trial court continued: "So as to [the photograph], at the moment I am not ruling that it's admissible unless I hear some other reason that it would be relevant. [¶] My indication at the moment is that it is not admissible, but that could change, quite honestly, when I hear some evidence. [¶] If there is some evidence that makes this relevant, then I'm going to reconsider it, but at this point in time, given that the victim, from what I understand, as -- from an offer of proof from each side, is that the victim is at the side of the road with a disabled car, I don't see any reason that his gang affiliation, if there is any, is relevant. He's not acting as part of a gang at that time. [¶] And there's no indication by the defendant that this person is

19

acting as a gang member or that this person is dressed as a gang member or there's any indication at all that there is any connection to a gang at that time. [¶] That being the case, there is no relevant purpose, and it would not be admissible. But again, that could change."

The next day, after the prosecutor's opening statement, defense counsel argued a "sympathetic" photograph of Valdez shown to the jury during the prosecutor's opening statement "open[ed] the door" to the photograph depicting Valdez showing apparent gang signs. The prosecution described the photograph used during the opening statement as "a plain photo of [Valdez] standing there in a dark hat, a Polo shirt and a jacket," and explained he was wearing a dark hat and a dark jacket on the night he was murdered. Defense counsel countered: "We have a picture of [the victim] with sagging pants, throwing gang signs in a red shirt. That is a more accurate picture of [the victim] that should now be introduced into evidence . . . ."

The trial court again ruled the photograph to be inadmissible, this time adding Evidence Code section 352 as a basis for exclusion: "[T]he probative value of the victim wearing gang clothing and throwing gang signs, when he is not otherwise dressed in that manner or doing anything at all related to gang activity [the night of the murder], or that the defendant didn't even know that he was in a gang or didn't know the victim at that time, there is no probative value at all, and the prejudicial effect and the excessive use of time to deal with gang experts or gang evidence that we would have to go through would do nothing more than confuse the jury and shed a different light on this when there is no evidence of gang activity in this case."

At the close of the prosecution's case, defense counsel raised the issue "one more time," arguing: "I know that you've ruled that the picture of [the victim] in the gang attire should not be admissible and that you didn't want to go down the gang road, but thereafter [the prosecutor] played the entire tape of [defendant] where he talked

20

extensively about the [Pirus] and the Boss Hog[g]s, and he said he thought -- I think he said with clarity that he thought that [the victim] was one of the Boss Hog[g]s or [Pirus]. He talked about how sick and tired he was of being harassed by them." The trial court confirmed its prior ruling.

Finally, defense counsel also sought to admit a photograph of Valdez from the Department of Motor Vehicles (DMV) for the same purpose as the prosecution's photograph of Valdez, described above. Defense counsel argued: "It actually shows his height and weight and how he physically -- how his face appeared." The prosecutor pointed out the height and weight on the DMV photograph was not consistent with the coroner's testimony as to Valdez's height and weight during the autopsy. The trial court excluded the photograph, stating: "The photo [the prosecutor] showed was actually the photo that was used when the witnesses identified the victim or the person they knew as [Valdez]. [¶] Inaccuracy of height on here is of some concern."

**B.**

*Analysis*

Evidence Code section 350 provides: "No evidence is admissible except relevant evidence." Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Conversely, irrelevant evidence is evidence "having no probative value; not tending to prove or disprove a matter in issue." (Black's Law Dict. (8th ed. 2004) p. 848, col. 1.)

Here, the photograph of Valdez in which he is wearing red and appears to be showing gang signs, assuming it actually depicts gang-related conduct, does not have any tendency in reason to prove a disputed fact. As we have explained, in order to reduce murder to voluntary manslaughter under a heat of passion theory, defendant would have had to reasonably believe Valdez provoked him by breaking into his house. However,

21

membership in a gang "does not lead reasonably to any inference as to the conduct of a member on a given occasion. Hence, the evidence was not relevant. It [would have] allowed, on the contrary, *unreasonable* inferences to be made by the trier of fact that [Valdez] was guilty of [the burglary] on a theory of 'guilt by association.' " (*In re Wing Y.* (1977) 67 Cal.App.3d 69, 79.) This case is a perfect example. Assuming Valdez was a member of a gang, there is no evidence he was engaged in any gang-related activity the night he was brutally murdered. Instead, overwhelming evidence supports the view he made a poor decision to drive while intoxicated and ended up on the side of the road waiting for his friends to return with tow chains to pull his SUV out of a ditch. Nor did defendant have any reason to believe Valdez was a gang member. He candidly admitted to Detective Swisher he "didn't recognize [Valdez] one bit" and "didn't see nothin'" that would have indicated to defendant that Valdez was a gang member. Defendant simply assumed his house was burglarized by gang members and Valdez was one of the gang members who had broken into the house. The photograph, of which defendant had no knowledge prior to his encounter with Valdez the night of the murder, does not make it any more likely Valdez broke into defendant's house or that defendant both actually and reasonably believed he did so.

Moreover, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) This provision "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," but also "requires that the danger of these evils substantially outweigh the probative value of the evidence. This balance is particularly delicate and critical where what is at stake is a criminal defendant's liberty." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; *People v. Tran*

(2011) 51 Cal.4th 1040, 1047.) Accordingly, Evidence Code "section 352 must bow to the due process right of a defendant to a fair trial and his [or her] right to present all relevant evidence of significant probative value to his [or her] defense. [Citations.] Of course, the proffered evidence must have more than slight relevancy to the issues presented. [Citation.]" (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 599.)

Here, even assuming the photograph depicting Valdez making what appear to be gang signs had some relevancy to the issues presented, it was slight and the probative value insignificant. Weighing against this weak showing of probative value is the "substantial danger of undue prejudice" inherent in gang evidence. (*People v. Cardenas* (1982) 31 Cal.3d 897, 904-905.) Moreover, as the Attorney General correctly observes, "proving affiliation with a criminal street gang could very well have led to a trial within a trial" in which both sides would have wanted to call gang experts to testify concerning the hand signs depicted in the picture, the colors worn by the Boss Hoggs and Pirus, and other such issues, which "would have focused the jury's attention on gang issues, rather than on [defendant's] state of mind—the real issue given that [he] admitted to unlawfully killing Valdez." The same reasoning applies to other unspecified "gang affiliation evidence" defendant also argues was erroneously excluded.

Turning to the DMV photograph, this evidence was properly excluded because, as the trial court explained, the information contained on the photograph was inaccurate. The photograph was also cumulative of the victim in life photograph offered by the prosecution.

The trial court did not abuse its discretion in excluding gang affiliation evidence, including the photograph of Valdez wearing red and making what appear to be gang signs. Nor did the trial court abuse its discretion in excluding the inaccurate and cumulative DMV photograph.

23

DISPOSITION

The judgment is affirmed.

                                       _____HOCH\_\_\_\_\_, J.

We concur:

_____ROBIE\_\_\_\_\_, Acting P. J.

_____BUTZ\_\_\_\_\_, J.