Filed 10/13/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088045 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F07862) |
| v. | |
| TEVITA TIKONI KAIHEA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Maryanne G. Gilliard, Judge. Affirmed as modified.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Supervising Deputy Attorney General, Robert Gezi, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts I, II, IV, V, VI and VII.

1

This is another case involving a murder arising from gang warfare, this time between the Tongan Crips and Norteños. A jury found defendant Tevita Tikoni Kaihea guilty of first degree murder and also found him guilty of multiple offenses involving a crime spree preceding the murder. The trial court sentenced defendant to an aggregate prison term of 111 years and four months to life.

On appeal defendant challenges (1) the admission of certain gang evidence as cumulative and highly prejudicial, (2) the court's failure to instruct the jury on the defense of mistake of fact and transferred intent, and (3) the court's instruction that the jury could consider gang evidence in deciding whether defendant acted in self-defense and heat of passion, and (4) he maintains those errors were cumulatively prejudicial. He also (5) challenges the imposition of a gang enhancement sentence to his murder conviction, (6) contends the trial court improperly calculated custody credits, and (7) contends the court improperly deducted actual days served credit for his jail behavior. Both defendant and the People separately note (8) the trial court erroneously awarded conduct credit.

In the published portion of this opinion, we reject defendant's third contention and conclude the standard instruction, CALCRIM No. 1403, is legally correct as it relates to the use of gang evidence for the purpose of deciding whether a defendant actually believed in the need to defend himself or acted in the heat of passion. To the extent that a modification should have been made to include defense of others, the contention is forfeited. We further conclude that defendant has failed to show ineffective assistance of counsel grounded on the failure to request the modification because the failure did not prejudice defendant. A legally correct modification would have been one that told the jury that gang evidence could be considered for the limited purpose of deciding whether the defendant actually believed in the need to defend himself *or someone else* and that *he acted under fear of imminent death or great bodily injury alone*. Thus, while CALCRIM No. 1403 could have been modified here, the legally correct modifications would not

2

have helped defendant. In the unpublished portion of this opinion, we conclude that some of defendant's other contentions have merit. As to the fifth, sixth, seventh, and eighth contentions, we will strike the 10-year gang enhancement, direct the trial court to award an additional 213 days of credit, and strike the award of conduct credits. We will also direct the trial court to correct several errors in the abstract of judgment. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Crime Spree Before the Murder

Defendant's contentions mostly arise from a murder that capped a three-hour crime spree. The crime spree began when defendant and his codefendant, Charlie Hola,[1] stole a van and drove it to a fast food restaurant, where they robbed two people at gunpoint.

About a half-hour later, defendant and the codefendant drove by the home of T.L. who, seeing the van, became suspicious that the van's occupants had been involved in a robbery the previous night, when some of T.L.'s marijuana had been taken. T.L. got his gun and drove after the van. When it came to a stop, he started photographing the van. Defendant stepped out of the passenger side of the van and shot his gun six or seven times.[2] The first shot hit T.L. in the face. He survived, though a bullet remains in his head.

### The Gang Altercation and Murder

About an hour later, defendant and codefendant arrived at Sacramento City College where surveillance cameras would capture the murder. In the video, which was played for the jury, the victim, R.G. and a companion, R.R., can be seen walking down

---

[1] Hola is not party to this appeal.

[2] After the shooting, someone opened the passenger side door to T.L's truck, and later, the gun T.L. had, which had been on the passenger seat, was missing.

3

the street. Both were Norteño gang members, and R.G. was wearing a red belt, a Norteño color.

R.G. and R.R. crossed paths with defendant and the codefendant, before exchanging looks and squaring off. As defendant approached the two Norteños, R.G. dropped his backpack. The codefendant came after R.G., who, in turn punched at the codefendant. The codefendant then delivered multiple blows, primarily to R.G., and then exchanged blows with R.R., who was next to them. The codefendant, thereafter, continued to fight with both of the Norteños.

At some point during the melee, R.R. stabbed the codefendant four times, including in the chest. In the video, R.R. can be seen, as one witness described, "making movements towards" the codefendant, "you can't see the knife, . . . but you can presume that's when the stabbing had occurred because he's moving in close, close enough to [the codefendant] . . . ."

The codefendant continuously fought and appeared to be aggressively advancing on the Norteños when defendant approached, appearing to draw a gun from under something he was carrying. He then pointed the gun and ran forward shooting at R.G., with whom the codefendant was exchanging blows at the time. The two Norteños turned and began running. A witness described defendant as "continuously, actively shooting the victim, who was [lying] on the ground." R.R. ran off. Defendant then jogged away, and the codefendant followed, walking some distance behind and brushing his hair back. A man working nearby heard "the first guy" say something to the effect of "you didn't see nothing."

Police found the codefendant on a park bench a block and one-half away, bleeding. R.R. sustained a bullet graze wound on his left hip.

4

**Forensic Evidence**

R.G. died from multiple gunshot wounds. The bullet trajectory for each wound was from the back of his body to the front.[3]

Nine-millimeter shell casings found at the murder scene were matched to the shell casings found at the scene where T.L. was shot, thus establishing that the same gun was used in both shootings. The gun was never recovered.

**Gang Evidence**

The jury heard evidence that defendant and the codefendant were members of the Tongan Crips street gang. In 2014, Tongan Crip graffiti was found in defendant's bedroom and that same year, he told an officer he "does mess with the Tongan Crips." After his arrest in this case, he was seen making a Crip sign as he passed a jail pod where Blood gang members were housed, and he came to court wearing shoes marked with Tongan Crip gang graffiti. Images on defendant's Facebook page showed a group of people making gang signs and simulating holding guns. Defendant also has "TC," short for Tongan Crip, tattooed under his eye.

The jury also heard evidence that from 2014 to the time of the murder, the Norteños were the main rivals of Tongan Crips, and a state of war existed between the two gangs at the time of the murder here. The feud began in mid-2013 when defendant's brother was killed by Norteños. The jury also heard evidence regarding a 2015 shooting of two Norteños by Tongan Crips, a 2014 shooting of Tongan Crips by two Norteños, and four predicate offenses by Tongan Crips.

**The Defense**

The defense put on no witnesses. In closing argument, as to the fast-food restaurant robbery, defense counsel told the jury: "I'm not going to go into very much

---

[3] Entry wounds were located in left side of R.G.'s back, the back of his right hip, back left thigh, and left leg above the calf.

detail about the [restaurant] because you can see the video and you can see what happened." Counsel reminded the jury that there was no shooting and no one got hurt.

As to the attempted murder of T.L., counsel argued T.L. may have been pointing a pistol rather than his camera before he was shot.

And as to the murder, counsel argued defendant acted in self-defense and defense of others, in that he opened fire trying to prevent the codefendant from being stabbed to death.

### Verdicts and Sentencing

The jury found defendant guilty of first degree murder for R.G.'s death (Pen. Code, § 187, subd. (a); count 1)[4] and found the crime was committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)), and that defendant personally discharged a firearm causing death (§ 12022.53, subd. (d)). For T.L., the jury found defendant guilty of attempted willful, deliberate and premeditated murder (§ 664/187; count 2) and found a firearm enhancement true (§ 12022.53, subd. (d)). It also found him guilty of two second degree robbery counts (§ 211; counts 3 & 4) with firearm enhancements (§ 12022.53, subd. (b)), felon in possession of a firearm (§ 29800, subd. (a); count 5), and unlawfully taking or driving a vehicle (§ 10851, subd. (a); count 7).[5]

The trial court imposed an aggregate term of 111 years and four months to life, calculated as follows: 25 years to life for first degree murder, along with a 25-year-to-life firearm enhancement, and a 10-year gang enhancement; and seven years to life for attempted willful, deliberate and premeditated murder, along with a 25-year-to-life firearm enhancement; five years (the upper term) for one robbery count, along with a 10-

---

[4] Undesignated statutory references are to the Penal Code.

[5] Only the codefendant was charged in count 6, felon in possession of a handgun, related to a gun found in his bedroom. Firearms analysis determined that gun was not used in the murder or attempted murder charged here.

year firearm enhancement; one year (one-third the midterm) for the other robbery count along with a three-year four-month enhancement (one-third the midterm). A concurrent term and a time-served jail sentence were imposed for the felon in possession of a firearm and taking or driving a vehicle counts, respectively.

## DISCUSSION

### I. Gang Evidence

Defendant challenges the admission of certain gang evidence as cumulative, highly prejudicial, and having minimal probative value. He points to three gang-related incidents: (1) a 2014 investigation of a shooting where a gun, ammunition, and gang graffiti were found in his home; (2) a 2014 gang shootout involving his codefendant and where defendant was found with an empty ammunition magazine; and (3) a jail incident following his arrest in this case, where defendant was attacked by several Norteños.

As to the first two incidents, we agree that certain aspects of those incidents should have been excluded under Evidence Code section 352. The failure to exclude them, however, was harmless.

### A. The First Incident — The 2014 Shooting

### 1. Additional Background

The first incident was described in the prosecution's moving papers as follows: "Shooting investigation where [defendant] identified as possible shooter. [Defendant] has a .45 handgun and gang graffiti in his bedroom. [The codefendant] and [another individual] contacted with [defendant]." At the hearing, the prosecutor elaborated, explaining the victim had been shot in the abdomen and thigh. A witness identified defendant as the shooter, and clothing matching the description of the shooters were found near the codefendant who was found outside defendant's house. Inside defendant's bedroom, police found two guns, the ammunition in one matching casings found at the shooting scene. Tongan Crip graffiti was also found in defendant's bedroom.

7

Defense counsel argued the evidence was "prejudicial and not probative at all." The trial court responded, "[i]t's certainly probative as to [defendant's] gang involvement." Ultimately, the court allowed the evidence, noting, "I think it's significant that there's gang graffiti and the gun together in a bedroom and all these people [defendant and codefendant] are located together." It also allowed testimony that ammunition in defendant's bedroom was similar to shell casings found at the shooting scene. But the court prohibited the prosecution from referring to defendant as the possible shooter, stating: "everything other than he's identified as the possible shooter will come in."

At trial, the prosecution offered testimony from a responding officer that on March 21, 2014, officers investigating a shooting went to defendant's home. There, they found both defendant and the codefendant outside the home. In their "vicinity," officers found clothing matching the description of the shooter's. A search of defendant's bedroom uncovered an antique revolver, a .45-caliber handgun, methamphetamine, cocaine, and heroin.[6] Ammunition in the handgun matched the brand and caliber of casings found at the shooting scene. Tongan Crip graffiti was on defendant's bedroom mirror.

## 2. Analysis

On appeal, defendant argues evidence of the loaded handgun in his bedroom, the clothes outside his home, and the shooting itself should have been excluded as irrelevant. He notes that evidence of the possession of a weapon that was not used in the charged crime is generally not relevant or admissible.[7]

---

[6] Defense counsel raised no objection to the testimony about the drugs.

[7] Defendant cites *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392-1393 [" 'Evidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant' "].)

The People respond that the evidence helped show defendant was a Tongan Crip and the charged murder was committed to benefit a criminal street gang. The prosecutor never argued the gun showed defendant was the type to carry deadly weapons. And the jury was instructed not to consider gang evidence to show defendant's character. As to the shooting itself and the clothes found nearby, the People argue that evidence provided context for the search of defendant's home. We agree with defendant.

Only relevant evidence is admissible. (Evid. Code, § 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210) Evidence Code section 352 authorizes the trial court to exclude relevant evidence where the probability of undue prejudice substantially outweighs probative value. (*People v. Powell* (2018) 5 Cal.5th 921, 961.) Such undue prejudice is not the type of evidence that merely undermines the defense or demonstrates guilt, but evidence that "inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction." (*People v. Valdez* (2012) 55 Cal.4th 82, 145.) We review the trial court's decision to admit evidence over an Evidence Code section 352 objection for abuse of discretion. (*Valdez*, at p. 145.)

Here, we find an abuse of discretion as to the challenged testimony. Regarding the evidence of gun possession, we note the gang expert testified that one of the primary activities of the Tongan Crips is illegal weapons possession. However, there was no evidence indicating defendant's possession of a firearm at the time it was found was illegal.[8] Consequently, the guns had no tendency to prove a primary activity or any

---

[8] The parties stipulated that defendant was convicted of a felony on November 3, 2014, eight months after the guns were found in his bedroom, and there is no evidence that

9

disputed fact of consequence.  Likewise, nothing indicates the shooting or clothes were relevant to a disputed issue.  No evidence proffered during the in limine hearing, or that the jury heard, established that shooting was gang related, much less that it involved Tongan Crip–Norteño warfare.  The clothes similarly bore no relevance to a disputed fact.  The evidence was prejudicial as it implied to the jury that defendant had been involved in an unrelated shooting.  Moreover, there was no relevant need to provide as "context" the evidence of the shooting and clothing to understand the import of gang graffiti found in defendant's bedroom or that he was in the company of the codefendant at the time the graffiti was found.

Accordingly, admitting evidence of the shooting, guns, ammunition, and clothes was an abuse of discretion.

### B.  The Second Incident — the 2014 Shootout

### 1.  Additional Background

The second incident was described in the prosecution's motion as a "Shooting investigation where [the codefendant] and [another individual] are arrested for possessing and attempting to dispose of guns.  [Defendant] at the scene with a handgun magazine."

At the hearing, the prosecutor elaborated that police responded to a shooting and "it's chaos."  "[B]oth sides have fired weapons in a shootout . . . ."  A witness told police that he took the codefendant and another Tongan Crip somewhere to hide guns, which police later found.  The Tongan Crip admitted "sho[oting] back" in the shootout and implied the codefendant did as well.  Defendant "was also there at the time of the shooting" and was found with an unloaded .45-caliber magazine and shells of the same

---

either of those guns were the basis for the conviction.  Thus, based on the trial evidence, the felony underlying his felon in possession of a firearm conviction does not support a finding that his possession of the firearms found in his bedroom was illegal. Consequently, that possession is not relevant as evidence of the gang's primary activity of illegal gun possession.

caliber were found at the scene.  Defendant also admitted to "messing with the Tongan Crips."

When the trial court asked who they were shooting at, the prosecutor responded: "The other side is never identified other than apparently Hispanic gentlemen, but we don't know."

Defense counsel objected as cumulative and more prejudicial than probative, adding, "We've got plenty of stuff to establish he's a gang member."  The trial court responded, "I think what's unique about this situation is you have both [codefendant] and [defendant] together."  The trial court allowed the evidence, explaining: "Are they prejudicial?  Absolutely.  But the district attorney is in a position where they must prove beyond a reasonable doubt that these defendants committed these offenses on behalf of and in association with and to further the Tongan Crip gang.  And, therefore, the People are entitled to put on this evidence."

Later at trial, evidence was presented that on July 5, 2014, four months after defendant's bedroom was searched, there was a shootout between Tongan Crips and Sons of Samoa.  As a detective involved in the investigation described, two people were shot: one in the thigh, one in the head.  "There were multiple kids all around."  A responding officer contacted defendant and found an empty .45-caliber magazine in his hoodie pocket.  Defendant told the officer he "does mess with the Tongan Crips"[9]  The jury also heard testimony that the codefendant was one of the shooters, and along with his cousin (who was a Tongan Crip) hid guns used in the shooting.

---

[9] No objection was interposed, and it is not raised on appeal, but the testimony makes clear he was responding to a question for jail booking purposes.  See *People v. Elizalde* (2015) 61 Cal.4th 523.

11

## 2. Analysis

Defendant argues the evidence was cumulative as to his gang membership and the Tongan Crips' status as a criminal street gang.  He adds that the magazine in his pocket was not relevant to any disputed issue, and evidence that he and codefendant were together was insignificant because it was undisputed they spent the day of the murder together.

The People respond that the incident helped prove the Tongan Crips were an active gang and showed defendant was associated with them.  Further the magazine connected defendant to the shootout.  Again, we agree with defendant.

Like the first incident, portions of the second incident were highly probative and admissible.  Defendant's statement that he "does mess with the Tongan Crips," plainly went to his gang membership.  And again, being in the company of the codefendant was also relevant.  But evidence related to the shooting (including the testimony that children were present) and the hidden guns and magazine risked undue prejudice.

The shootout evidence was not necessary for the jury's understanding of defendant's statement that he "does mess with the Tongan Crips" and by itself offered little probative value other than it established the gang had an altercation with the Sons of Samoa.  It was marginally probative of the Tongan Crips' status as a gang.  But that was more firmly established through other proffered evidence, including the four predicate offenses.

Similarly, defendant's possession of the empty magazine at best connected him to the shootout, which together helped establish his ties to the Tongan Crips.  But it was far less probative than his admission of, "mess[ing] with the Tongan Crips."  And there was a substantial danger of undue prejudice as it implied defendant was the type to engage in shootouts.

Accordingly, we conclude the trial court abused its discretion in admitting evidence beyond defendant's statement that he "does mess with the Tongan Crips" and being in the company of the codefendant.

### C. The Third Incident -- The Norteño Jail Attack

#### 1. Additional Background

The final challenged incident was described in the prosecution's motion as: "[defendant] assaulted by 3 Norteño gang members … while in custody on this case." The court allowed the evidence over the defense's objection, explaining "I think there is sufficient logical nexus to find that there was an ongoing . . . gang war between the Tongan Crips and the Norteños. That it continues on even after [defendant] is arrested." It added, "it is strong circumstantial evidence to support the People's theory that this shooting and stabbing did not occur in an isolated context." The court also noted it would be clear that defendant was the victim in the attack.

Thereafter, the prosecution's gang expert testified in front of the jury that defendant was assaulted and knocked unconscious by four Norteños, shortly after arriving at the Rio Cosumnes Correctional Center. The attack, the expert explained, had been authorized by the Norteño chain of command. After the incident, defendant was reclassified and housed away from Norteños.

#### 2. Analysis

On appeal, defendant argues that evidence should have been excluded as cumulative because there was ample evidence he was a Tongan Crip. He points to evidence that he wore shoes with gang graffiti to court and that he made a Crip gang sign while passing the jail pod where Blood gang members were housed. He also argues there was ample evidence of open warfare between the Tongan Crips and Norteños. We disagree with defendant as to this evidence.

Evidence that defendant was attacked by Norteños shortly after his arrest was highly probative of the state of war between the Tongan Crips and Norteños, as well as

13

defendant's status as a Tongan Crip.  While other evidence established those points, the jail attack uniquely demonstrated that the war existed at the time of the murder.  And it was not unduly prejudicial as the evidence squarely presented defendant as the victim.

The trial court acted within its discretion in admitting this incident.

### D.  Harmless Error

Having determined that some of the evidence related to the first and second incidents should have been excluded, we consider whether defendant was prejudiced. Defendant argues the evidence likely led to the jury convicting him based on his assumed violent propensities.  He adds that substantial evidence raised a reasonable doubt as to whether he acted to defend the codefendant, or at a minimum, acted in the heat of passion.  We disagree.

Error under Evidence Code section 352 is reviewed under the *Watson* reasonable probability standard.  (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.)  We will reverse only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' "  (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

We conclude it is not reasonably probable defendant would have obtained a more favorable result had the erroneously admitted evidence not been admitted.  While that evidence suggested defendant had been involved in previous shootouts and is unquestionably damaging character evidence, it is no more so than the undisputed evidence of the three-hour crime spree in this case.  Defendant stole a van, robbed a fast-

14

food restaurant at gunpoint, and possessed a gun as a felon.  Thereafter, he indisputably shot one person in the face, another in the hip, and another, killing him.  The violence inflicted against the murder victim at the time of the supposed defense of others was excessive and not directed at the person who stabbed the codefendant.  As one witness put it, defendant "continuously, actively [shot] the victim, who was [lying] on the ground."  Each of the bullets defendant fired entered the back of R.G.'s body and travelled from back to front.  The jury could draw no conclusion from the erroneously admitted evidence that it could not draw from the undisputed facts established by undisputedly admissible evidence.  Indeed, the video recording of the murder – which showed defendant shooting R.G. as he and R.R. turned to run – was far more likely to sway juror opinion than evidence peripherally connecting defendant to two shootings several years prior.

Thus, we conclude the erroneously admitted evidence was harmless.

## II.  Mistake of Fact Instruction

Defendant next challenges the trial court's failure to instruct the jury, sua sponte, on the defense of mistake of fact and the principle of transferred intent.  While the jury had been instructed on self-defense and defense of others, defendant argues the jury should have been instructed that if he killed R.G. in the mistaken belief that he was the stabber (rather than R.R.) defense of others was still available.  He maintains substantial evidence supports the instruction in that it is reasonably inferred from the video that he came to his codefendant's defense after the stabbing but mistakenly thought the victim was the stabber because the victim was fighting the codefendant.  And it is reasonable to conclude the codefendant would have asked for help after being stabbed.  He also argues that such an instruction was not inconsistent with the defense he advanced at trial.

We conclude defendant's claim fails for a number of reasons.

15

## A. Additional Background

Before deliberations began, the trial court instructed the jury on self-defense and defense of others: "A defendant is not guilty of murder, attempted murder, manslaughter or attempted manslaughter if he was justified in killing someone in self-defense or defense of another." Such a defense, the jury was told, required that "defendant reasonably believed that he or [the codefendant] was in imminent danger of being killed or suffering great bodily injury. Defendant's belief must have been reasonable and (he/she) must have acted only because of that belief."

In his closing argument, defense counsel argued defense of others: "I think it's pretty obvious by now that the focus of this case is on whether [defendant] acted . . . in defense of [the codefendant] when he shot and killed [R.G.]." Counsel addressed the prosecution's argument that defendant had not seen any stabbing, but had purposely targeted R.G. because of something the victim had said.[10] Counsel told the jury, "you'll have a chance to go through [the video] as many times or as slow as you want to when you're in deliberations," urging that defendant could see his codefendant being stabbed, "It's not that far away." Counsel continued: "What I submit to you this isn't like somebody stops and takes aim. I want to shoot that guy. Not the other one but that guy. Not the guy that's stabbing my friend. What I submit to you it's more likely boom, boom, boom, boom. He just starts shooting at them when he has a shot away so he's not going to hit [codefendant]. That's all he was doing. Trying to defend his friend from being stabbed to death."

---

[10] The prosecutor had argued that defendant had intentionally aimed for R.G.: "He's not aiming for [R.R.]. [R.R.] gets grazed one time in the hip. [Defendant] has no idea there's a knife involved." The prosecutor argued that R.G. was targeted because of something he said: "That's why [defendant] is aiming for [R.G.] because he's the one that responded to whatever was said."

16

The codefendant's trial counsel echoed the point: "Once [R.R.] starts sticking that knife and [R.G.] is going at him too, these guys are acting as a pair." "[T]he shots that [defendant] fired got [R.G.] and [R.R.] off of [the codefendant] before additional fatal blows were inflicted upon him with the knife that [R.R.] had."

## B. Analysis

A trial court must instruct the jury, sua sponte, on defenses relied on by the defense or that are supported by substantial evidence and not inconsistent with the defense's theory of the case. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1224 (*Rangel*).) "Substantial evidence supporting sua sponte instruction on a particular defense is evidence that is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable [persons] could have concluded' " ' that the particular facts underlying the instruction did exist." (*People v. Brooks* (2017) 3 Cal.5th 1, 75.)

Here, no sua sponte duty to instruct on mistake of fact arose. Substantial evidence did not support the instruction. For the defense of mistake of fact related to a specific intent crime, there must be proof the defendant *actually* had a mistaken belief of fact. (*People v. Zinda* (2015) 233 Cal.App.4th 871, 880; *People v. Lawson* (2013) 215 Cal.App.4th 108, 115.) Defendant did not testify. Nor did the codefendant or R.R. And there was nothing else from which a jury could reasonably conclude defendant shot the victim because he had actually seen the codefendant get stabbed, but mistakenly believed R.G. was the stabber.

Defendant's argument that he came to his codefendant's defense after the stabbing, mistaking R.G. for the stabber, is speculation.[11] It assumes without evidence

---

[11] Defendant argues the evidence must be viewed in the light most favorable to the defense. But in support, he cites two cases explaining that in reviewing a failure to instruct on a *lesser included offense* the evidence is considered in the light most favorable

that defendant saw the stabbing but nevertheless mistook R.G. for the stabber. Such speculation is not substantial evidence obligating the trial court to instruct sua sponte. And as to defendant's argument that the codefendant called for help, nothing in the record supports that hypothesis. Indeed, the video shows that defendant jogged away from the scene after shooting R.G. without even checking on the codefendant, who after the shooting, followed defendant, walking some distance behind.

Moreover, a mistake of fact instruction was inconsistent with the defense's theory. At no point did defense counsel argue defendant targeted R.G. believing he was the stabber. Rather the defense theory was that defendant saw the stabbing, tried to help, but had no time to aim at a particular person. Indeed, defense counsel explicitly argued against the idea that defendant had deliberately targeted R.G.: "What I submit to you this isn't like somebody stops and takes aim. I want to shoot that guy. Not the other one but that guy. Not the guy that's stabbing my friend. What I submit to you it's more likely boom, boom, boom, boom. He just starts shooting at them when he has a shot away so he's not going to hit [codefendant]."

Defendant nevertheless urges that the argument that he simply fired away when his codefendant was stabbed "did not remove" the defense of mistake, nor would it "subvert" his counsel's argument to also argue that he shot the victim with mistaken belief. But a theory that defendant actually believed R.G. was the stabber was hardly compatible with the defense advanced at trial. A mistake of fact argument grounded on the idea defendant intentionally shot R.G. *multiple times* in the back side of his body because he thought R.G. had stabbed the codefendant likely would have been met with skepticism and undermined the theory advanced by defense counsel, because the force

_____

to the defendant. He offers no authority of a similar obligation when reviewing a failure to instruct sua sponte on a possible defense. And our Supreme Court has not articulated such an obligation. (See e.g., *Rangel, supra,* 62 Cal.4th at p. 1224; *People v. San Nicolas* (2004) 34 Cal.4th 614, 669; *People v. Breverman* (1998) 19 Cal.4th 142, 157.)

defendant intentionally used against R.G. would likely have been viewed as excessive. The theory of random shooting without aiming was far more compatible with the number of shots defendant fired and where those shots entered R.G.'s body.

We conclude no error arose from the failure to instruct on mistake and transferred intent.

## III.  Instruction on the Use of Gang Evidence

Defendant next contends the trial court erred in instructing the jury that it could consider gang evidence in deciding whether defendant acted in self-defense or heat of passion.  We disagree.

### A.  Additional Background

The jury was instructed with the standard instruction, CALCRIM No. 1403:  "You may consider evidence of gang activity only for the limited purpose of deciding whether: The defendant acted with the intent, purpose and knowledge that are required to prove the gang-related enhancement charge; [¶] Or the defendant had a motive to commit the crime charged in Count 1 [murder]; [¶] *Or the defendant actually believed in the need to defend himself; [¶] Or the defendant acted in the heat of passion*."  Each of these limited purpose options are bracketed options in the standard instruction.  (See CALCRIM No. 1403, italics added.)

Defense counsel did not object to the instruction, and the parties agreed as to all instructions (except for two not at issue on appeal).

### B.  Analysis

Defendant argues the instruction was at best ambiguous as it gave no explanation for how the jury should consider gang evidence in deciding whether he acted to defend his friend or in the heat of passion.  At worse, according to defendant, it told the jury it could reject those defenses solely because he was a gang member.  He also maintains that no authority stands for the proposition that gang evidence is relevant to defense of another or heat of passion.

19

Defendant acknowledges his trial counsel failed to object, but he maintains the claim is cognizable because it affects his substantial rights. Alternatively, he claims his counsel rendered ineffective assistance in failing to object.

Regarding his substantial rights argument, defendant overlooks that CALCRIM No. 1403 is a limiting instruction, and consequently, the trial court had no sua sponte duty to give it at all. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1052 [Because defendants did not specifically request a limiting instruction related to the use of gang evidence, the court had no sua sponte duty to give one].) Moreover, defendant cannot fault the trial court for not modifying CALCRIM No. 1403, sua sponte. "[A] defendant may raise for the first time on appeal instructional error affecting his or her substantial rights. [Citations.] But '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428; Accord, *People v. Hardy* (2018) 5 Cal.5th 56, 91; See also *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 (*Samaniego*) [aiding and abetting instruction].) When an instruction as given is correct in law, it is incumbent on defendant to request clarifying language, and his failure to do so forfeits the issue. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877; *Samaniego*, at p 1163.).

We conclude the instruction given here was correct in law. Indeed, a similar challenge to CALCRIM No. 1403 was raised in *Samaniego, supra,* 172 Cal.App.4th 1148, which found the standard instruction neither contrary to the law nor misleading as to the bracketed options for motive and credibility. (*Id*. at p. 1167.) Rejecting the challenge as to the bracketed option for motive, the court explained that "[g]ang evidence is relevant and admissible when the very *reason for* the underlying crime, that is the motive, is gang related." (*Ibid*., italics added.)

We agree with *Samaniego*. And we further note that motive, self-defense, and heat of passion are similar in that they all relate to the reason why a defendant engaged in

20

the alleged conduct. Here, the question was why did defendant shoot R.G. — was it because he was motivated to kill a warring gang rival, was it because he believed in the need to defend himself or others, or was it because of a sudden quarrel/heat of passion? The interrelationship of these reasons for engaging in homicidal conduct has long since been recognized; evidence of motive is relevant to refute a claim of self-defense or sudden quarrel/heat of passion. (*People v. Hall* (1938) 27 Cal.App.2d 440, 445.)

And while no published case holds that gang evidence is relevant to defense of others, there is decisional authority holding that evidence of gang membership is directly relevant to the genuineness of the belief of the need to defend oneself, because such evidence can demonstrate that a defendant killed because of a gang-related motive as opposed to self-defense. (*People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1252-1253.) We conclude the same applies to defense of others. Moreover, our Supreme Court has explained that a defendant who kills a gang rival is not entitled to claim self-defense where he acts not based on *fear alone* but also because of a desire to kill a rival because of gang related animus.[12] (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044 (*Nguyen*).)

Here, evidence of defendant's gang activity logically informed a determination of whether he was motivated to kill a gang rival because of the war between his gang and the Norteños. Moreover, defendant had a personal gang-related motive — his brother was killed by Norteños in the first skirmish in the ongoing war between the two gangs. CALCRIM No. 1403, as given, was thus, correct in law as it informed the jury it could consider gang evidence for the limited purpose of establishing whether defendant actually believed in the need to defend himself.

---

[12] As noted, the jury was instructed: "The defendant must have believed there was imminent danger of death or great bodily injury [to] himself or someone else. The Defendant's belief must have been reasonable and *he must have acted only because of that belief*." (Italics added.)

As for sudden quarrel/heat of passion, a killing " 'may be reduced to voluntary manslaughter if the victim engaged in provocative conduct that would cause an ordinary person with an average disposition to act rashly or without due deliberation and reflection.' " (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) But "[t]he standard is not the reaction of a 'reasonable gang member' " and our high court has recognized that gang related challenges between individuals do not induce sufficient provocation in an ordinary person to establish heat of passion. (*Ibid*.) Moreover, " 'the accused must be shown to have killed while under "the *actual influence* of a strong passion" induced by such provocation.' " (*Ibid*., italics added.) A person acting because of gang related animus or revenge does not act under passion that would reduce a killing to voluntary manslaughter. Consequently, gang related evidence can be considered for the limited purpose of deciding whether a defendant killed in the heat of passion.

We therefore conclude that CALCRIM No. 1403 as given here was legally correct as it instructed the jury that gang evidence may not be considered for any purpose other than the listed limited purposes, and it instructed the jury that it may not conclude from such evidence that defendant is a person of bad character or has a disposition to commit crime. To the extent the instruction failed to fully explain the contours of how gang evidence inform a self-defense, defense of others or sudden quarrel/heat of passion determination, it was incumbent upon defendant to seek clarifying language.

To that, defendant asserts he was deprived of effective assistance of counsel, apparently based on the asserted failure to request a clarification modification. But he makes no suggestion as to how the instruction should have been clarified in a way that would be both legally correct and of benefit to him. As we have noted, the instruction was legally correct as to self-defense and sudden quarrel/heat of passion. And, in our view, the only legally correct modifications that could have been made would not have helped defendant. Such clarification would have resulted in an instruction that told the jury the gang evidence could be considered for the limited purpose of deciding whether

22

the defendant actually believed in the need to defend himself *or someone else* and that he *acted under fear of imminent death or great bodily injury alone.*

The bracketed option, in the pattern instruction — "Or the defendant actually believed in the need to defend himself" — could have been modified to include the need to *defend someone else.* But since the instruction limited the purpose for which the gang evidence could be used to whether defendant actually believed in the need to defend himself and told the jury it could not be used for any other purpose (other than the other three listed limited purposes), the instruction effectively barred the jury's use of the gang evidence to negate defense of others. Consequently, trial counsel was not deficient for failing to ask for clarification in this regard; nor was defendant prejudiced. If the request had been made to add defense of others, it would not have benefited defendant.

Similarly, regarding the requirement that a person claiming self-defense "act under that fear alone," as we have noted, a defendant who kills a gang rival is not entitled to claim self-defense where he or she kills because of fear of death or great bodily injury and also because of a desire to kill a rival because of gang related animus. (*Nguyen, supra,* 61 Cal.4th at p. 1045 [" '[T]he circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted *under the influence of such fears alone*' "; if emotions other than fear, such as a desire to kill a gang rival, are a causal factor, then the killing cannot be justified on the theory of self-defense].) Consequently, to articulate a correct statement of the law pertinent to this case, any clarification to CALCRIM No. 1403 should have included the "fear alone" principle. But a clarification telling the jury that gang evidence could be considered for the purpose of determining whether defendant acted under fear of imminent death or great bodily injury alone would not have inured to defendant's benefit.

To establish ineffective assistance of counsel, a defendant must establish that he was prejudiced. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674, 693-694, 696]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) To

23

establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 89, 104 [178 L.Ed.2d 624, 642].)  To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient.  (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.)  "The likelihood of a different result must be substantial, not just conceivable." (*Richter*, at p. 112.)

Defendant has not shown prejudice, because although CALCRIM No. 1403 could have been modified here, the legally correct modifications would not have helped defendant.  Thus, while the failure to object to CALCRIM No. 1403 forfeits defendant's contention regarding the instruction, ineffective assistance has not been established.

## IV.  Cumulative Error

Defendant claims the above errors were cumulatively prejudicial.  Having rejected every contention except the first, the claim of cumulative error is essentially a rehashing of defendant's first contention.  (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["claims previously rejected on their substantive merits—i.e., this court found no legal error— cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate"].)  And having found the error as to the first contention harmless, we reject the claim of cumulative error.

## V.  The 10-Year Gang Enhancement

Defendant next challenges the imposition of a 10-year gang enhancement to his term for first degree murder.  He argues the enhancement is inapplicable to a conviction punishable by life imprisonment.  The People agree, and so do we.

At sentencing, the trial court imposed for count 1, first degree murder, a 25-year-to-life term along with a 25-year-to-life firearm enhancement and a 10-year gang enhancement under section 186.22 subdivision (b)(1)(C).  The gang enhancement

generally mandates a 10-year gang enhancement where a "violent felony" is committed to benefit a criminal street gang. (§ 186.22, subd. (b)(1)(C).)

But both parties point out that *People v. Lopez* (2005) 34 Cal.4th 1002, 1004, held the 10-year subdivision (b)(1)(C) enhancement does not apply to a violent felony punishable by life imprisonment. Rather, subdivision (b)(5) of section 186.22 provides an exception for such convictions: " 'any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life, shall not be paroled until a minimum of 15 calendar years have been served.' " (*Lopez,* at p. 1006.) The *Lopez* court concluded a first degree murder conviction punishable by a 25-year-to-life term comes within that exception, and the 10-year subdivision (b)(1)(C) enhancement is inapplicable. (*Lopez,* at pp. 1006-1007.)

Thus, under *Lopez*, the 10-year gang enhancement was erroneously applied here. We will therefore strike the punishment for it.

## VI.  Credits

### A.  Custody Credit Calculation

Defendant contends he is entitled to three additional days of custody credits. The People agree, as do we.

At sentencing, the clerk reported defendant had 1,041 actual days of credit. But as the parties note, defendant was arrested on October 16, 2015 and was sentenced on August 24, 2018, with no indication of any break in custody. Counting the starting and ending dates, defendant accrued 1,044 days of actual custody — not 1,041.

We will award three additional days of custody credit.

### B.  Deduction of Actual Days

Defendant contends the trial court unlawfully reduced his actual days of credit by 210 days for misconduct while in custody. The People again agree, as do we.

Defendant's probation report reflected a litany of jail violations incurred prior to sentencing. Each violation was punished with anywhere from 2 to 30 days of full

25

restriction.  At sentencing, the clerk told the trial court defendant had 1,041 days of actual credit, adding, "we deducted the 210 for his jail behavior.  That left 831."

Nothing empowers a trial court to deduct actual days.  Indeed, section 2900.5 subdivision (a) requires "all days of custody of the defendant" be credited to a defendant.

We will restore the 210 actual days.

### C.  Conduct Credits

The abstract of judgment reflects an award of 96 days of conduct credit.  Both defendant and the People note that because defendant has been convicted of murder, he is ineligible for conduct credit.  (§ 2933.2, subd. (a) ["any person who is convicted of murder, as defined in Section 187, shall not accrue any credit, as specified in Section 2933 or Section 2933.05"]; *People v. Wheeler* (2003) 105 Cal.App.4th 1423, 1432 ["[S]ection 2933.2 applies to the offender not to the offense and so limits a murderer's conduct credits irrespective of whether or not all his or her offenses were murder"].)

We will therefore strike the 96 days of conduct credit.

### VII.  Correction to Abstract of Judgment

We have noted several typographical errors in the abstract of judgment for the indeterminate term.  It reflects a conviction for second degree murder for count 1, rather than first degree murder.  And on count 2, it reflects a conviction "Attempt Murder w/GBI," rather than attempted willful, deliberate and premeditated murder.

We will direct the trial court to correct those errors in an amended abstract.

### DISPOSITION

The judgment is modified to strike the punishment for the 10-year gang enhancement (§ 186.22, subd. (b)(1)(C)) as to count 1, first degree murder.

The judgment is further modified to award an additional 213 days of actual credit. The award of 96 days of conduct credit is stricken.

The trial court is directed to prepare an amended abstract of judgment reflecting the revised custody credits and correcting the typographical errors discussed in section

26

IX.  The trial court is further directed to send a certified copy to the Department of Corrections and Rehabilitation.

As modified, the judgment is affirmed.

/s/
MURRAY, Acting P. J.

We concur:

/s/
RENNER, J.

/s/
KRAUSE, J.